IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

UNITED STATES OF AMERICA,

                   Plaintiff

     v.

MELVIN THOMAS,

                  Defendant.

REPORT AND
RECOMMENDATION

12-cr-155-wmc

_____

## REPORT

Before the court for report and recommendation is defendant Melvin Thomas's multi-part motion to suppress evidence, dkt. 50.  For the reasons stated below, I am recommending that the court deny this motion in all parts.

Over two years ago, on November 28, 2012, the grand jury returned a three count indictment against Thomas, charging him in Count 1 with being a member of a heroin trafficking conspiracy operating between Madison and Chicago from September 2010 to December 2010, and in Counts 2 and 3 with possessing heroin with intent to distribute it on November 10, 2010 and December 10 2010.  The path from indictment to trial has been tortuous, due in part to Thomas's obdurate opinion–unshared by any of his four appointed and discarded attorneys–that some of the evidence against him should be suppressed because of what he views as the illegal placement of a GPS device on a vehicle parked on private property and the improper geographic extension of this investigation into Illinois by Wisconsin law enforcement agents.  But the pending motion to suppress does not raise either of these challenges.  The most concise overview as *why* neither issue is before the court can be found in portions of the transcripts of ex parte hearings held on August 8, 2014 and October 16, 2014. *See* dkt. 108 at 15-16, 17-38 and 46-48; dkt. 125 at 6-17 and 24-27, all under seal.  The

government has no access to these particular transcripts but that is of no concern at this juncture because the bottom line is that the government has had input on the only pending suppression motion, dkt. 50, filed almost a year ago, on January 10, 2014.  For what it's worth, I note that Thomas is immensely frustrated that none of his four appointed attorneys would support the suppression issues that *he* views as meritorious.  This is one reason that Thomas chose to undermine his attorneys' ability to maintain a viable attorney-client relationship with him.

The 18-page suppression motion that actually is before the court seeks to suppress different evidence.  It took almost ten weeks to get this motion teed up for a March 18, 2014 evidentiary hearing.  *See* January 15, 2014 text only order (dkt. 52); January 16, 2015 text only order (dkt. 53); January 31, 2014 text only order (dkt. 57); February 21, 2014 text only order (dkt. 59); February 28, 2014 text only order (dkt. 60); transcript of March 18, 2014 evidentiary hearing (dkt. 63, hereafter "Tr.").

By the time of the hearing, the lynchpin evidentiary dispute was whether there actually had been a state probation warrant lodged against Thomas on December  10, 2010 at 12:30 a.m. when a state trooper performed a traffic stop on a minivan in which Thomas was traveling. Attorney Delyea, on Thomas's behalf, was not contesting the validity of the traffic stop, which was predicated on driving at night with no headlights.  Rather, Delyea contended that the agents investigating Thomas for drug trafficking had fabricated the existence of a state probation warrant in order to take Thomas into custody.  Accordingly to Attorney Delyea, Thomas's illegal arrest on the non-existent probation warrant led to the generation of additional evidence against Thomas, all of which should be suppressed.  Tr. at 13-17.  Delyea also proffered additional grounds to suppress other evidence generated on December 10, 2010 following his arrest.

2

As the judge who presided over the March 18, 2014 evidentiary hearing, I will find facts in the next section, but first I note that the issues raised in Attorney Delyea's suppression motion fell by the wayside as this case lurched forward.  In April, 2014, Attorney Delyea got distracted pursuing his suspicion that the NSA might have improperly assisted the DEA in this investigation and then covered its tracks with "parallel construction" of the evidence against Thomas and his alleged coconspirator, Domingo Blount (not charged in this district).  *See* April 2, 2014 text only order (dkt. 69); transcript of April 2, 2014 ex parte hearing (dkt. 70, under seal).  The court did not support Delyea's digression and pointed out that the existence of the probation warrant was the issue that the parties were supposed to be briefing.  April 21, 2014 ex parte order (dkt. 72, under seal).  Even so, the court permitted Attorney Delyea to pursue his parallel construction theory, *see* May 2, 2014 text only order (dkt. 73).  The government chimed in with a May 7, 2014 letter (dkt. 75), pointing out that there was no evidence of any such government malfeasance, but if there were, then the U.S. Attorney's Office would disclose it pursuant to its clear discovery obligations under *Brady v. Maryland*, 373 U.S. 83.  The government further contended that the "phantom warrant" issue (and its derivatives)  were a legal canard in light of the attenuation doctrine enunciated in *Brown v. Illinois*, 422 U.S. 590, 603 (1975).

By June 17, 2014, Attorney Delyea was reporting that he and Thomas no longer could work together.  *See* June 17, 2014 text only order, dkt. 81.  The court held an ex parte hearing the next day and gave Attorney Delyea permission to withdraw.  The court noted that the January 10, 2014 motion to suppress remained in want of briefing.  Text only order, dkt. 83; *see also* transcript of June 18, 2014 ex parte hearing, dkt. 97, under seal, at 20-21, 26.

3

On June 27, 2014, the Federal Defender appointed Attorney Robert Ruth as Thomas's fourth attorney.  On July 10, 2014, the court granted Attorney Ruth's request for some time to review and investigate Attorney Delyea's pending suppression motion.  July 10, 2014 captioned order, dkt. 88.  On August, 4, 2014, Attorney Ruth reported in an ex parte motion that he had researched the suppression issues and discussed them with Thomas, which led to an impasse so severe that Attorney Ruth was asking to withdraw.  August 4, 2014 ex parte motion, dkt. 92, under seal.  On August 8, 2014, the court held an 80-minute ex parte hearing with Thomas and Attorney Ruth, at which they agreed to attempt to work together on the suppression issues.  *See* August 8, 2014 text only order, dkt. 96.  Attorney Ruth then filed a motion to suppress data obtained by means of the GPS tracking device attached to a vehicle used by Thomas, *see* dkt. 98, and on August 15, 2014, the court held a telephonic status conference with the attorneys for both sides, at which we planned how to pursue Thomas's suppression contentions.  *See* August 15, 2014 text only order, dkt. 102.

At a September 24, 2014 telephonic status conference, Attorney Ruth reported that, in light of the government's disclosures regarding its placement and use of the GPS tracking device, he saw no basis to seek suppression of this evidence.  In light of Attorney Ruth's position, the court noted that only Attorney Delyea's earlier-filed motion to suppress, dkt. 50, remained on file, and that Attorney Ruth could have until October 3, 2014 to brief it if he wished, but that he was not required to do so in light of his view of the evidence.  September 24, 2014 order, dkt. 107.  Attorney Ruth did not file a brief on this motion.

On October 12, 2014, Attorney Ruth filed his second motion to withdraw as counsel (dkt. 112, under seal) and the court held an ex parte hearing on October 16, 2014.  After

hearing from Thomas and Ruth, the court granted the motion and advised Thomas that by burning through four appointed attorneys, he had constructively made the decision to defend himself pro se, a conclusion that Thomas hotly disputes.  The court gave Thomas until November 13, 2014 to file any additional briefs on the motion to suppress.  October 16, 2014 captioned order, dkt. 115.

Next, on October 23, 2014, the *government* filed a 20-page brief in opposition to all of the contentions raised in Attorney Delyea's January 10, 2014 motion to suppress.  *See* dkt. 117.  On November 13, 2014, Thomas filed a three-page handwritten letter asking for a postponement of his briefing deadline, claiming that he could not brief any of the issues that *he* wanted to brief until the court held an evidentiary hearing on them.  Dkt. 123.  The court already had repeatedly advised Thomas that it was not going to hold an evidentiary hearing on issues that his attorneys explicitly had declined to pursue.  Therefore, I am denying Thomas's request (I will issue a separate text only order to this effect) and I am submitting this report and recommendation based on the record as it exists at this time.

At the March 18, 2014 evidentiary hearing, I heard and saw the witnesses testify and made credibility determinations.  Based on this, and based on all the documents before the court, I find the following facts regarding Thomas's motion to suppress evidence, dkt. 50:

FACTS

**1.  The State Probation Warrant for Thomas**

On December 10, 2010 at about 12:28 a.m., Trooper Jonathan Fenrick of the Wisconsin State Patrol was on routine patrol in the Madison metropolitan area when he received a radio

report of a vehicle northbound on Highway 51 (Stoughton Road) with no headlamps on.
Trooper Fenrick located the vehicle, a gray Dodge minivan, and performed a traffic stop.[1]
Porcha Bell[2] was driving and Melvin Thomas was a passenger.  Thomas gave his correct name.
Bell, who had a warrant out for her arrest, gave a false last name.  Trooper Fenrick ran both
names through his computer;  the computer showed Thomas with a suspended driver's license
but no arrest warrants.  Troop Fenrick found no information whatsoever regarding "Porcha
William," which led him to believe she had lied to him about her identity.  He planned to–and
eventually did-- take "Williams" into custody and place her in his squad care so he could conduct
a fingerprint check at the jail.

Unbeknownst to Trooper Fenrick, Thomas was the subject of an ongoing drug task force
investigation.[3]  Apparently because of this, two MPD officers (who were not part of the task
force investigation) were directed by their lieutenant to respond to the scene.  They pulled up
during Trooper Fenrick's traffic stop, followed by an MPD officer with a drug-detecting dog, and
a bit later by MPD Detective Dorothy Rietzler, who was the lead detective in the task force
investigation of Thomas.  Det. Rietzler had learned of this traffic stop from the on-duty MPD
lieutenant. (The GPS device was not on this minivan and the drug task force was unaware that
Thomas had made this trip to Chicago).  Det. Rietzler already had information that in the past,
Thomas had asked women to accompany him to Chicago to pick up heroin, then conceal it in

---

[1]  The minivan's lights were unlit because they were malfunctioning.  The minivan was in such
disrepair that when the traffic stop concluded, a wrecker had to tow it away.  *See* dkt. 50-1 at 15 of 30.

[2]  The transcript spells her first name like the car, "Porsche," but she actually spells it "Porcha."

[3]  The Dane County Narcotics and Gang Task Force includes agents and officers from the DEA,
the Madison Police Department (MPD) and the Dane County Sheriff's Office, among others.

their vaginas during the drive back to Madison.  Based on the circumstances of this fortuitous traffic stop of Thomas and Bell, Det. Rietzler asked for and received permission from the Lieutenant to visit the scene to investigate further.  *See* dkt. 50-1 at page 7 of 30; *see also* Tr., dkt. 63 at 68.

MPD Officer Terrance Loos knew Thomas from previous law enforcement contact, including contact related to drug trafficking.  According to this court's December 17, 2012 pretrial service report, Thomas had been convicted in state court of drug trafficking felonies in 1995, 2001 and 2004 (among other felony convictions) and had been arrested on March 12, 2010 on a heroin trafficking charge.  *See* dkt. 5 at 2-5,  Officer Loos was aware that Thomas also used the alias "Thompson."[4]  After the dog alerted to the odor of controlled substances emanating from the minivan, Officer Loos approached Thomas, who still was seated in the minivan and asked him to step out.  Officer Loos patted down Thomas, handcuffed him and placed him in the back seat of Officer Loos's squad car.

Officer Loos then ran his own computer check on Thomas and determined that there was an active arrest warrant issued for Thomas/Thompson by the Wisconsin Department of Corrections ("DOC"), which was supervising Thomas as part of a state sentence.  Officer Loos double-checked this "hit" with the Dane County Dispatch Center, which also located the active probation warrant for Thomas/Thompson.  Officer Loos formally arrested Thomas on this warrant and took him to the Dane County Jail to be booked.  The jail independently confirmed

---

[4] The grand jury indicted Thomas under both last names. In fact, this court briefly lost contact with Thomas at the Dane County Jail, because we did not know that the jail had booked him under the name "Thompson."  *See* staff notes dated October 29, 2014 and November 6, 2014, and dockets 119 & 121.

the existence of an active probation warrant for Thomas before booking him and taking him into custody.

Detective Rietzler remained on the scene to interview Porcha Bell.  At 1:20 a.m.,  Bell admitted that she was smuggling a golf ball-sized lump of heroin in her vagina that she and Thomas had picked up in Chicago earlier that day.  Bell was taken to jail, where, at about 2:24 a.m., she retrieved and presented the smuggled heroin, which weighed 24.9 grams. *See* Dkt. 50-1 at 8-9 of 30.

Thomas's state probation officer was Sue Tomaszewski.  Tomaszewski did not recall issuing an arrest warrant for Thomas on or before December 10, 2010, but when she came to work that morning, this warrant was in the system under the name "Melvin Thompson." Tomaszewski had received an email advising that Thomas had been arrested on this warrant earlier that morning, so she entered an "apprehension cancellation" into the system.  According to  Tomaszewski, a rotating group of supervisory probation officers in the DOC's  "Warrants" division is on call overnight every night at an 800 number so that probation warrants can be entered into the system after hours.  Such after-hours contacts and decisions to issue warrants would not necessarily be commemorated in writing beyond the issuance of the warrant. Tomaszewski's file on Thomas does not contain any contain any documentation showing who issued the probation warrant, when they issued it, or why. *See* Tr., dkt. 63 at 56-57, 60-61. Tomaszewski admitted that her chron file for Thomas did not contain all of the information that it should have, *id.* at 53, 57-58.

At the evidentiary hearing, in response to questioning by the court, Det. Rietzler testified that, to her knowledge, no one associated with the drug task force or any other law enforcement

officer had any input or causal effect in getting an after hours probation warrant filed against Thomas.  Tr., dkt. 63 at 75.

### 2.  Consent Search at 4004 Bruns Avenue

According to police reports submitted into the record (in other words, no witness testified about these matters at the evidentiary hearing), at about 4:16 a.m. on December 10, 2010, Det. Rietzler and DEA Special Agent Jerry Becka visited Thomas's residence at 4004 Bruns Avenue where he lived with Anita Andrews.  After talking for a while with the agents, Andrews gave verbal consent for them to search the residence.  The agents did not search any areas that obviously were in the exclusive control of Thomas.  In common areas of the residence they found a digital scale, cutting agents, and 22 baggies with the corners cut off, all indicia of drug trafficking.  *See* dkt. 50-1 at 9-10 of 30.

### 3.  Thomas's Telephone Calls from the Jail

According to police reports, Det. Rietzler and Agent Becka visited Thomas at the jail around 7:20 a.m. on December 10, 2010 and attempted to interview him.  Thomas chatted with them briefly, then invoked his right to counsel.  The agents terminated the interview.

At about 8:20 that morning, Thomas initiated a telephone call from the jail's telephone for detainees, calling someone called "Ma."  Thomas told Ma that he had to contact "'Nita" immediately to direct her to get rid of what was hidden in his stash spots, and then she had to come to the jail to get from Thomas the keys to his Cadillac because there was $2640 in the glovebox."  *See* dkt. 50-1 at pages 17-18 of 30.  Det. Rietzler used a recording of this call to

obtain a search warrant for the Cadillac.  Officers found the cash; according to the government, they also found documents linking Thomas to a telephone number from which heroin-related calls had been intercepted during a Title III wiretap of a different telephone in Chicago.  *See* United States Response, dkt. 117, at 6 and 6, n.2. Anita Andrews subsequently admitted to agents that she had destroyed two $50 bags of heroin.  *See* dkt. 50-1 at 18 of 30.

ANALYSIS

**I. Abandonment of These Suppression Issues**

Failure to brief an argument constitutes waiver and abandonment; skeletal arguments, if undeveloped, do not suffice to put an argument before the court.  *United States v. Hussein*, 664 F.3d 155, 161 n.2 (7th Cir. 2011).  After Attorney Delyea filed this multi-part suppression motion, he learned that Thomas was significantly more interested in different suppression issues (the GPS device, the interstate investigation); Attorney Delyea  then found a suppression issue in which *he* was more interested.  Even so, the court did not consider the original motion abandoned, and it continued to offer both Delyea and then Attorney Ruth an opportunity to brief it.  After reviewing the record, Attorney Ruth chose not to brief this motion, instead focusing on the GPS issue that seemed so important to Thomas.  Attorney Ruth determined that the GPS issue had no traction, to Thomas's consternation.  This led Attorney Ruth to seek and eventually obtain leave to withdraw.  At that point, the January 10, 2014 suppression motion was under advisal, unsupported by a post-hearing defense brief.  Even so, the court offered Thomas the opportunity to brief this motion after the court determined that Thomas was to proceed pro se.  Thomas objected to all of this.

10

The government nonetheless filed a lengthy brief responding to every argument that Attorney Delyea had floated in his initial motion.  Thomas never replied to the government's brief.  Thomas's recent letters to the court focus instead on his claim that he needs an attorney to represent him at trial.

I suppose the court could, in Gordian fashion, avoid the tangle of a legal analysis by simply denying the pending suppression motion as having been abandoned by the failure of Delyea, Ruth and Thomas to brief it.  That said, I have followed the government's lead and analyzed each portion of the suppression motion.  The result is the same: I am recommending that the court deny the motion in its entirety.

### 2.  The State Probation Warrant for Thomas

In Attorney Delyea's January 10, 2014 motion to suppress evidence, he accuses Detective Rietzler of improperly using probation officer Tomaszewski as a "stalking horse" in order to avoid the Fourth Amendment's warrant and probable cause requirements.  As the cases he cites indicate, such arrangements are most often seen when a police officer wants to conduct a *search* but doesn't have probable cause to support a warrant.  Dkt. 50 at 9.  Thomas's argument in support of suppressing his arrest requires a few more steps: according to Attorney Delyea, but for Thomas's arrest on the probation warrant, he would not have made the recorded jail telephone call.  This call is incriminating by itself, but it also led the police to the Cadillac that contained cash and linked Thomas to incriminating telephone calls, and it led the police to re-interview Andrews, who admitted that she destroyed two small bags of heroin at Thomas's behest.

11

The government's response in opposition develops the analysis in much greater detail than Attorney Delyea did.  *See* dkt. 117 at 6 - 10.  All of the government's points are valid, but two seem to be the most salient: first, the warrant actually *was* in the system at the time Thomas was arrested and there is no persuasive evidence that it was put there at the behest of the drug task force.  Second, the doctrine of attenuation would seem to militate against suppression regardless of how the probation warrant got into the system.

The government concedes that the evidence does not reveal the pedigree of the probation warrant.  Tomaszewski, who is retired, had only a vague recollection of these incidents and she conceded that her file on Thomas was incomplete.  Tomaszewski noted that in any event, after-hour warrants don't always get documented properly.  Det. Rietzler testified that she could not recall the whats, hows and whens of her interaction with probation, but that at some earlier point she had passed along her belief that Thomas was transporting heroin from Chicago to Madison.  Regardless of this murkiness, a probation warrant actually was in place at the time Officer Loos checked the computer.  Det. Rietzler explicitly disavowed any knowledge of any task force meddling that would have led to the issuance of this warrant.  It is hard to fathom how the warrant got put into the system after hours unless someone from the task force asked for it, but I have no basis to disbelieve Det. Rietzler's sworn testimony, so I accept it as true.  In sum, there is no evidence of any police questionable police conduct that would trigger the exclusionary rule.

But even if this court were take a more skeptical view of the evidence, this wouldn't help Thomas.  Let's suppose, *arguendo,* that Det. Rietzler was more causal than she now recalls in obtaining a probation warrant for Thomas after midnight on December 10, 2010.  She already

12

knew that Thomas's *modus operandi* was to employ a female accomplice to body smuggle heroin, and this unplanned traffic stop of Thomas and Bell fit the M.O. tightly.  Let's also suppose, *arguendo*, that Det. Rietzler, after learning from her lieutenant that Thomas and Bell had been stopped northbound on Stoughton Road, actually *did* call the after-hours Warrants Section number to apprise the duty officer of what she knew.  This information, when considered in light of Thomas's three prior drug trafficking felonies—the last of which appears to be the basis of his current supervision--was enough information to support a probation hold on Thomas pending further investigation.

In Wisconsin, probationers are subject to seizure and a hold if a probation officer "has reason to believe that [he] had committed a violation."   Reasonableness is determined by the facts and circumstances of each case.  *State v. Goodrum*, 152 Wis.2d 540, 547-58 (Wis. App. 1989); *see also State v Flagstadt*, 265 Wis.2d 938 at *1 (table case, 2003); *State v. Smith*, 145 Wis.2d 898 at ** 2-3 (table, 1988).  Thomas, therefore, was subject to administrative detention upon reasonable suspicion that he had engaged in new criminal conduct.  *United States v. Meece*, 580 F.3d 616, 618-19 (7th Cir. 2009); *Knox v. Smith*, 342 F.3d 651, 657 (7th Cir.  2003), *citing United States v. Knights*, 534 U.S. 112, 122 (2001).  Reasonable suspicion is something more than a hunch but less than probable cause, existing when there is some objective manifestation that the suspect is engaged in prohibited activity.  *Knox*, 342 F.3d at 659; *see also United States v. Fiasche*, 520 F.3d 694, 697 (7th Cir. 2008*)*.  What Det. Rietzler knew before she even arrived on the scene would have supported after hours issuance of a probation warrant for Thomas..

Let's also keep in mind that within 50 minutes of Trooper Fenrick initiating the traffic stop, Porcha Bell had admitted to Det. Rietzler that Bell was, in fact, body-smuggling heroin for Thomas.  At that point, Thomas would have been subject to full probable cause arrest without regard to any probation warrant.  Given that Thomas did not have a valid driver's license (and his minivan was inoperable), it's as likely as not that in the absence of a probation warrant, Thomas still would have been on the scene at 1:20 a.m. waiting for a ride home.  (That said, Stoughton Road at Pflaum Road is not a limited access highway, so that Thomas could have departed on foot into an adjoining neighborhood, subject to subsequent pursuit and arrest by the police).

The government also points out that, regardless how or when the probation warrant got into the system, it *was* there; therefore, Officer Loos, who was not privy to the drug task force's investigation, was entitled to rely on that warrant in good faith.  *See Herring v. United States.* 555 U.S. 135, 146-47 (2009).  On this record, this is an accurate assessment of how the court could analyze the situation.  If, however, the court were to take the position that Det. Rietzler caused the issuance of the warrant that night in the absence of reasonable suspicion, then the government probably cannot rely on the good faith of her fellow officer as a basis to uphold the warrant and deny suppression. *Cf. United States v. Daoud*, 761 F.3d 678, 681-82 (7th Cir. 2014) (in *Franks* context, court does not hold the recklessness or false statements of nongovernmental informants against the government's affiant).  But there is no reason for the court to travel this path, since there was a reasonable basis to issue the warrant no matter what, and as discussed next, the doctrine of attenuation militates against suppression of the evidence.

### 3. Attenuation

The heart of Thomas's suppression motion is his argument that, but for the baseless probation hold, he would not have been in custody to make the damning telephone call that provided the probable cause to search his Cadillac and that caused the task force agents to re-interview Anita Andrews. The government responds that, even if Thomas's arrest was improper, Thomas's decision to make the self-incriminating telephone call is legally attenuated from the arrest and therefore cannot be a basis for suppression. The government is correct.

Almost 40 years ago, the Supreme Court rejected a "but for" rule regarding confessions following illegal arrests. *Brown v. Illinois*, 422 U.S. 590, 603 (1975). In other words, it is almost pointless for Thomas to argue that, but for the purportedly illegal probation hold, he never would have been put in the position of having to make a call to "Ma" on a monitored jail telephone to direct Andrews to retrieve and to destroy evidence.

Even assuming, *arguendo*, that Thomas was arrested illegally, suppression of his telephone call and evidence derived from it depends on the court finding that Thomas's decision to make the telephone call was not an act of free will. The suppression analysis of *Brown* presupposes that a defendant's incriminating statements resulted from police interrogation, then asks whether the statements were voluntary (as opposed to simply *Mirandized*). The question the Court asked in *Brown* is whether the defendant's *confession* was an act of free will, and therefore severable from whatever illegal seizure might have put the defendant in police custody in the first place. *Id.; see also Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963); *United States v. Reed*, 349 F.3d 457, 463 (7th Cir. 2003). The burden is on the government to establish this point, taking into account the time lapse between the allegedly illegal arrest, the presence of intervening

15

circumstances, and the purpose and flagrancy of the official misconduct.  *See United States v. Conrad*, 673 F.3d 728, 732-33 (7th Cir. 2012).

Here, the two-ton intervening event was Porcha Bell turning over the 25 grams of cached heroin and admitting that she had been carrying it for Thomas.  This gave the police probable cause to arrest Thomas on a new charge of possessing heroin with intent to distribute it.  This meant that even if Thomas had been *taken* into custody improperly, probable cause caught up to his arrest and rendered his continued custody completely legal.  But there's more: after this, Det. Rietzler and Agent Becka attempted to interview Thomas; after Thomas received his *Miranda* advisals, he invoked his right to counsel, which the agents scrupulously honored.  Only then did Thomas use the jail telephone to make his call.  This sequence of events and their time line establish that even if the initial probation hold on Thomas had been entered improperly, Thomas's decision to use the telephone to attempt to hide drugs and money from the police was completely attenuated from his initial arrest.  Thomas is understandably angry that he was put in a position to have to make this call in the first place, but the call itself and Thomas's directions were not prompted by anything the police said or did.  Thomas cannot seriously contend that his allegedly improper arrest requires suppression of his imprudent but entirely voluntarily statements.

In sum, this court should not quash Thomas's arrest or any evidence derived from it.


### 4.  Consent Search at 4004 Bruns Avenue

In Attorney Delyea's January 10, 2014 motion, he alleged that Anita Andrews did not voluntarily consent to the search of the residence she shared with Thomas.  Andrews, however,

16

never submitted an affidavit and did not testify at the evidentiary hearing, so she has never claimed that her consent to search was not voluntary. In his motion, Attorney Delyea quotes portions of Det. Rietzler's recorded conversation with Andrews that morning, in which Det. Rietzler repeatedly asks for permission to search, and also indicates that if Andrews does not search, the agents will request a search warrant. There are no statements from Andrews declining to consent. Det. Rietzler's written report indicates that Andrews voluntarily consented. Therefore, this motion to suppress fails at the outset for lack of even prima facie support.

If it were to matter, the government points out that it is neither improper nor coercive for the police to state their genuine intent to seek a warrant if they have a basis for doing so. Given what the task force agents already knew at that point, as briefly (and only partially) synopsized above, they had sufficient information to seek–and to obtain–a search warrant for the residence where Thomas lived. *See, e.g., United States v. Jones*, 614 F.3d 423, 426 (7th Cir. 2010) (participation in drug trafficking can create probable cause to search the suspect's residence "because in the case of drug dealers, evidence is likely to be found where the dealers live.") This court should deny this portion of Thomas's motion to suppress evidence.

### 5. The Search Warrant for Thomas's Cadillac

Det. Rietzler sought and obtained a state search warrant for Thomas's Cadillac. A copy of that complaint and affidavit can be found at Dkt. 50-1, starting at page 21 of 30. In the motion to suppress, Attorney Delyea premises his suppression argument on a *Franks*, claim, arguing that Det. Rietzler's affidavit is tainted by the inclusion of information learned from the consent search of his residence and statements he made during his recorded jail telephone call.

17

As noted in the analysis above, there is no basis to suppress any of this undergirding evidence, so there is no basis to excise it from the warrant application.  There are other, minor quibbles with how Det. Rietzler presented certain evidence, but to quote Judge Evans, these attacks "amount to little more than throwing pebbles at a tank."  *United States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000).  There is no basis under *Franks* to quash this search warrant.

Attorney Delyea also points out that police held the impounded Cadillac for five days before actually searching it.  Delyea never briefed this matter further (actually, as already noted, he never briefed *any* of the issues raised in his motion; neither did Attorney #4, Robert Ruth.) The government has presented a thorough, persuasive and unrebutted  four-page argument as to why this delay should not augur suppression of evidence seized from the Cadillac.  *See* dkt. 117 at 16-19.  Taking a page–actually, taking the only sentence–from the Seventh Circuit's unpublished opinion in *Neri v. Monroe*, 567 Fed. Appx. 465 (7th Cir. 2014), I recommend that the court deny this portion of Thomas's motion "substantially for the reasons give by [the government]."

RECOMMENDATION

For the reasons stated above and pursuant to 28 U.S.C. § 636(b)(1)(B),  I recommend that the court deny all parts of defendant Melvin Thomas's motion to suppress evidence, dkt. 50.

Entered this 5th day of January, 2015.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
120 N. Henry Street, Rm. 540
Madison, Wisconsin 53703

Chambers of                                                                           Telephone
STEPHEN L. CROCKER                                                          (608) 264-5153
U.S. Magistrate Judge

January 5, 2015

David Reinhard                                    Melvin R. Thomas
Assistant United States Attorney                  Reg. No. 462488 - Cell Block 715
P.O. Box 1585                                     Dane County Jail
Madison, WI 53703                                 115 West Doty Street
                                                   Madison, WI 53703

Reed Cornia
Cornia Law, LLC
1213 North Sherman Avenue
Box 354
Madison, WI 53704

        Re:    United States v. Melvin R. Thomas
               Case No. 12-cr-155-wmc

Dear Counsel and Mr. Thomas:

        The attached Report and Recommendation has been filed with the court by the
United States Magistrate Judge.

        The court will delay consideration of the Report in order to give the parties an
opportunity to comment on the magistrate judge's recommendations.

        In accordance with the provisions set forth in the memorandum of the Clerk of Court
for this district which is also enclosed, objections to any portion of the report may be raised
by either party on or before January 19, 2015 by filing a memorandum with the court with
a copy to the opposing side.

        If no memorandum is received by January 19, 2015, the court will proceed to
consider the magistrate judge's Report and Recommendation.

                                        Sincerely,

                                        /s/

                                        Connie A. Korth
                                        Secretary to Magistrate Judge Crocker

Enclosures
/cak

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:

(1) injunctive relief;

(2) judgment on the pleadings;

(3) summary judgment;

(4) to dismiss or quash an indictment or information;

(5) to suppress evidence in a criminal case;

(6) to dismiss or to permit maintenance of a class action;

(7) to dismiss for failure to state a claim upon which relief can be granted;

(8) to dismiss actions involuntarily; and

(9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation.  Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the party objects and must set forth

with particularity the bases for these objections.  An objecting party shall serve and file a copy of the transcript of those portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection.  Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions of the report and recommendation to which a party objects.  The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection.  The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions.  The district judge, in his or her discretion, may conduct a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

**NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals.  *See United States v. Hall,* 462 F.3d 684, 688 (7th Cir. 2006).**